### THE KING v. THE JUSTICES OF SOMERSETSHIRE, 7 Dowl. & Ryl. 385.

" Pursuant to a peremptory mandamus from this court, the justices at the Somersetshire Epiphany Sessions, *heard the appeal of James Tucker*, against the decision of the Special Petty Sessions for the hundred of Winterstoke, in the county of Somerset, dismissing his application for relief *under the* 3 Geo. IV. c. 33, § 2 ; and found that Mr. T. had sustained damage to the amount of £30, &c., by having ricks of corn wilfully consumed by fire, &c., which they (the justices) adjudge to him to be paid by the hundred, &c.

Now, on referring to the application for the mandamus in the case of Mr. Tucker, 5 Dowl. & Ryl. 434, we find that the Court of King's Bench held, that an *appeal* lay from the Special Petty Sessions to the Quarter Sessions, in that case ; and *that they granted a writ of mandamus to the* justices of the county of Somerset, " commanding them to *hear the appeal.*" It appeared that when the appeal was presented for hearing at the Sessions, " they refused to entertain it, on the ground that nothing had been *done* by the Petty Sessions, in pursuance of the act, against which an appeal would lie, so as to give the *Quarter Sessions jurisdiction, and therefore the appeal was dismissed.*"

Here, if we are any judges of likenesses, was a case, not only " *much like the one at bar,*" but on principle, *ad idem*, with respect to this question of a mandamus to the court below, commanding them to hear and determine the appeal. And what was the result in the case in the King's Bench ? Why, as follows :

"In Easter Term, Mr. Tucker obtained a rule upon his justices to show cause why a mandamus should not issue commanding them to hear the appeal, upon notice of the rule, to the said justices or some of them. On the last day of Easter Term the rule was made absolute, on an affidavit of service upon these justices alone who had originally heard the complaint at the petty sessions, and upon the high constable of the hundred; and no cause being shown a mandamus was ordered to go, and the writ was served upon the same justices only. When the appeal was afterward presented for hearing at the Quarter Sessions, the justices then assembled refused to hear it, on an objection taken by the respondents' counsel, that the rule nisi, for the mandamus had been improperly served, not having been served upon more of the county justices. Now, on showing cause against the rule for quashing the writ of mandamus on the ground that it had been improvidently issued, two questions were raised: first, whether the Quarter Sessions had jurisdiction to entertain an appeal under the 3 Geo. IV., where the Petty Seesions had done nothing in pursuance of the act; and, secondly, whether the rule *nisi* had been properly served."

No doubt or question was raised, at the bar, as to the appropriateness of the remedy by *mandamus* to compel the Quarter Sessions to receive and hear the appeal if these questions were decided affirmatively. The court so decided, and Abbott, Ch. J., in delivering the opinion of the court says:

"I think we ought not to quash this writ. We are informed by the officers on the crown side that the service of the rule has been according to the constant course in similar cases."
"At the same time, however, if it could be shown that the writ had issued improperly, and commanded the justices at Sessions to do something which by law they had no power to do, it would be the duty of the court to quash it on the ground that it had been improvidently issued." "The question then is, whether if the justices at the Special Petty Sessions decide against the party complaining, *not upon the merits of the case*, but upon some opinion which they have formed of the law, which turn out to be erroneous, such a determination is not an *act* done? I think it is so. The ground of our decision is, that this was a dismissal of the complaint, *in consequence of a mistake of the law*, and not a dismissal upon a hearing of the merits." A peremptory mandamus was ordered to go."

Upon these authorities, without going further into the English cases, we should feel at liberty to rest our claim that this case of *The People ex rel. Doughty* v. *The Dutchess C. P.* was a proper case for a mandamus to *hear the appeal;* nay more, a very clear case for the exercise of that power. But we beg the reader's indulgence for presenting to his notice a few of the still more recent English decisions on this subject, as contained in the note subjoined.*

---

\* 1. *The King* v. *The Justices of Cumberland*, 4 Adolphus & Ellis, 695. (1836,) upon a rule to show cause why a mandamus should not issue, requiring them to hear the complaint of the overseers of *Wetheral*, in the said county against John Bowman for refusing to maintain his wife and child, it appeared that the owners had preferred a complaint against Bowman as a vagrant for refusing to maintain his wife and child; and being brought before two justices, he denied being married to the woman and produced some evidence to prove it; and he threatened the magistrates with an action if they committed him. The overseer offered evidence of a Gretna Green Marriage, but the justices refused to hear it, and dismissed the summons, saying that they would not, on this application, try a disputed marriage, alleged to have taken place, out of the county, and that the parties ought to try it in the Ecclesiastical Court.

"The Court of Kings Bench held that the justices, having begun to hear the complaint, were bound to *hear all.* It was urged as the argument against the mandamus, that they had virtually *heard the complaint.* (Lord Denman C. J. Then they stopped the party *against whom they decided.*) The court declined to hear the counsel in support of the rule.

Lord *Denman C. J.* It is quite clear that the justices have done wrong. They exercised their discretion in deciding at first to *hear the case;* then they were not right in refusing to *hear the whole* of the evidence offered. The rule must be made absolute.

2. THE QUEEN *v.* THE JUSTICES OF OXFORDSHIRE, 4 *Adolphus & Ellis*, N. S. 177. (Queen's Bench Reports.) 1843.

"Three persons were *jointly* summoned for unlawful fishing: they were heard *jointly* and convicted in *separate* penalties for each defendant. They gave a joint notice of appeal, under the act, as against " a conviction of *us,* &c., naming the three, and entered into separate recognizances.

Three *several* convictions, one of each defendant, being afterwards returned to the sessions, they *without hearing the merits, affirmed* the convictions, on the ground that the *notice of appeal misdescribed the convictions.*"

The Court of Kings Bench issued a mandamus commanding the sessions to *hear the appeals,* notwithstanding their judgment of *affirmance,* holding, that if there was any variance, (and semble, there was not,) it was one which

It seems too clear to admit of question, that upon the " broad ground" assumed by Mr. Justice Bronson, in this

could not mislead." (The case of *Regina* v. *The Justices of Denbighshire*, 9 Dowl. Pr. C. 509, was cited and *treated by the court* as conclusive.)

3. THE QUEEN *v.* THE JUSTICES OF THE WEST RIDING OF YORKSHIRE. Ad. & Ell. (Queen's Bench) Rep. 1. (1843 )

The return of the justices in this case to an alternative mandamus stated, that on notice of an order removing paupers from *Sheffield* to Crich, received, the overseers of the latter township gave notice to those of Shef-*field*, of an *appeal*, which they afterwards countermanded, but reserving the right to appeal when the paupers should be *actually removed*. At the following sessions the overseers of *Sheffield* according to the *alleged* practice of the sessions, entered an appeal against the order, as by the overseers of Crich, *but without their knowledge and consent:* and thereupon the order of removal was confirmed with costs. More than six months after the confirmation, the pauper was removed to C., whereupon the overseers of C. applied at the next sessions, " to erase the entry of the previous appeal and order of confirmation and to enter their appeal against the order of removal." The sessions refused. They submitted that they had no power to erase the entry of appeal and confirmation or to alter their records ; and that inasmuch as this order of removal had been confirmed, they had not entered another appeal and continuances, as commanded by the writ.

Lord Denman, C. J. This is a peculiar case. It may *perhaps* be the first time we have been called upon to erase an entry on the records of the sessions ; but it is not new in principle. The mandamus to enter continuances is in some respects, a stronger interference of this court. It is necessary for the purposes of justice that we should interfere ; for the sessions could not erase the entry without the authority of a mandamus. The entry may possibly altogether defeat justice ; for when the question of the validity of the order shall hereafter arise on appeal, the justices may refuse a case. When the erasure now called for has been made, they will discuss the order of removal on its merits. Colerige J. said. " The statutes give no such appeal to the removing parish. The practice is irregular and unjust, and is converted to a fraudulent purpose. If there were no other instance of a mandamus in such a case, I think there is a jurisdiction inherent in this court to make a precedent." Peremptory mandamus granted accordingly."

4. REGINA *v.* JUSTICES OF FLINTSHIRE, 2 Dowling & Lownde's, Queen's Bench Practice Court Reports, 143. 1844.

The Quarter Session in this case were called on to show cause why a mandamus should not issue, commanding them to enter continuances and heard an appeal against an order of justices for the removal of H. R. and her three

case, he would have refused the mandamus in all these later cases as well as those we have already cited : that he would have held them all "*judicial errors*," beyond the reach of a mandamus, since the decision in the case of the *Oneida Judges* v. *The People.* If this be so, is not the refusal of the mandamus in this case, as wide a " departure from the old law on this subject," as was the previous practice of issuing it to compel inferior courts, where they had already *decided* motions for new trial, &c. *heard on the merits,* to reverse their decisions even without a rehearing ? It strikes us very forcibly that the only distinction is, between a sin of commission and one of wilful omission ; a point of casuistry, as to the degree of culpability, which the schoolmen have not been able satisfactorily to decide.

---

children from the parish of Cum to the parish of L. L., in May, 1843. The sessions had already made an order quashing a former order of appeal, in general terms : " that the order be quashed," the respondents offered to show by *evidence*, that it was quashed on a *formal defeat only :* viz., on the ground that the examination of H. R. was defective in stating hearsay evidence. This evidence, however, the sessions refused to admit, because there was no entry on their minutes that the order had been quashed for want of form.

Colerige J. said ; I wish very much that this case had not been argued before me whilst sitting alone in this court ; for however clear the principle may be which governs our interference in such matters, the dividing line is ever subject to much doubt. It is clear that if the court below has heard the objection and decided it, this court is not a court of appeal to reverse their decision: if, on the other hand, they have refused to hear it, then this court will interfere and command them to do so. The question therefore is, has there been a hearing? As I understand the facts, the respondents having got a fresh order were met with the objection that the former order was conclusive ; and that the entry of its being quashed must be taken to mean on *the merits ;* and the sessions acting on this objection accordingly refused to hear *evidence* to explain the entry. In this I think they acted wrongfully. It is said that even if the evidence had been received, it could not have altered the decision to which the sessions came. But we must look at the whole circumstances of the case, and it is impossible not to see that the justices exercised no judgment in the matter. It is possible that if they had heard the evidence they might still have come to the same decision ; but then they would have decided the case *on a hearing ;* and this court would not have disturbed their decision. There is a fallacy in arguing as to the effect of the evidence when it was not heard. The rule must therefore, be absolute for a mandamus, commanding them to enter continuances and hear the appeal."

The few remaining cases upon this subject, reported since this decision of Mr. Justice Bronson are, *with one exception,* cases where the court could not, without " departing from the *old law,*" as it is termed, have allowed the writ to issue. With the decision in the case of *Ex parte Fitzgerald,* 23 Wend. 148, which was an awkward attempt to obtain a mandamus commanding the Judges of the N. Y. Superior Court, " to vacate a rule setting aside a verdict, and granting a new trial," certainly no fault can be found ; and it was a fit enough object of the Chancellor's pleasantry upon the subject of " *the novus hospes*"—as he termed that application : one which was of course denied.

In the case of *Ex parte Gordon,* 2 Hill, 263, and *Ex parte Brandlacht,* 2 Hill, 367, attempts still more preposterous were made to accomplish by writ of *Prohibition,* what, in such cases, the court would very properly, at all times, have refused to do by mandamus. On the first application, which was a motion for a *prohibition* to the Common Pleas *forbidding all further proceedings* in a case where they had *refused, on hearing,* to *quash an appeal ;* the court, Cowen, J., said: " This application is without precedent, and the motion is denied on the ground that a writ of prohibition will not lie, any more than a mandamus, for the purpose of reviewing a decision of an inferior court, because it is erroneous." The decision was undoubtedly correct; but the distinction so well established by the English authorities, between the case of a mandamus to control an inferior court when it *quashes an appeal without hearing,* and when it has *heard* and *quashed,* never appears to have entered the mind of Mr. Justice Cowen, after he had read and given in his plenary adhesion to the able and learned opinion of Mr. Senator Tracy, as above recorded.

The cases of *Ex parte Fleming and another,* 4 Hill, 581, of *The People, ex rel. Blacksmith* v. *P. L. Tracy,* First Judge of Genesee, 1 Denio, 617, of *Ex parte Koon and others,* 1 Denio, 644, and of *Elkins* v. *Athearn,* 2 Denio, 191, which were all motions for mandamus, in cases where decisions had already been had upon the *merits after hearing,* need no further note or comment.

46

The only remaining one is the excepted case to which we have adverted as among those subsequent to that of the *Oneida Judges.* That is the case of *Ex parte Ostrander,* 1 Denio, 679, Dec. Special T., 1845.

This was a motion for a mandamus to the Columbia Common Pleas, to compel that court to vacate a rule *dismissing* an appeal from a justice of the peace, and to proceed with the case, the appeal having been *quashed without hearing.*

"The court (Jewett, J.,) held, that the Common Pleas had acted *wrongfully* and *against the statute* in dismissing the appeal without hearing. He says, "A motion to dismiss an appeal, must be made at the first term of the Common Pleas for which there is time to give notice. The Common Pleas cannot, by *rule* granted at such *first* term, give leave to move to dismiss at a succeeding term. 2 R. S. 261, § 202. It was virtually an attempt to enlarge the time fixed by statute in which to perform a particular act. This is a power which the court did not possess." (5 Wend. 135 ; 7 Paige, 245 ; 9 ibid. 572.)

"The Common Pleas having decided otherwise, the important question arises whether this court, in the due exercise of its jurisdiction over inferior tribunals can correct the error by mandamus. It is argued that without the aid of this writ, the party is remediless. This is not a sufficient ground in itself to entitle the party to the writ. It is true that when a party has another legal remedy, a mandamus will generally be refused on that ground; but it is not true that because a party has no legal remedy unless by this writ, that it will be granted for that cause. The Common Pleas had *judicial cognizance* of the subject matter; and although I have no doubt that it *erred* in its decision, yet it cannot be corrected by mandamus. It was clearly a *judicial error.*" And cites to prove it, 18 Wend. 79 and 20, Id. 658, (the cases of *The Oneida Judges,* and of the *Dutchess Common Pleas.*)

From this decision of Mr. Justice Jewett we must take leave to dissent, if possible, still more strongly than from that of Mr. Justice Bronson in the case of *The People, ex rel. Doughty* v. *The Dutchess Common Pleas.* The easy nonchalance with which the learned judge *assumes* the grounds of his refusal to interfere, viz : that "the Common Pleas had *judicial cognizance* of the subject matter," and that "it was clearly a *judicial error,*" indicates sufficiently

that he had embraced the creed of his predecessor, Mr. Justice Cowen, as avowed in the case of *The People, ex rel. Fuller* v. *The Oneida C. P.*, where he said—" I shall not feel myself warranted in consenting to a mandamus for the purpose of disturbing any *judicial decision whatever of any inferior court or magistrate.*" For what can be clearer, than that if the Common Pleas of Columbia, in *direct violation* of the statute, as Mr. Justice Jewett well proves, extended the time to move to dismiss the appeal to the next term, that it had not judicial cognizance, in any legal sense of the term, of the " subject matter ?" The statute expressly forbade them to entertain the " subject matter," and their action in refusing to hear and in dismissing the appeal, was *extra judicial, coram non judice*, and utterly void. In such a case, the King's Bench, as we have seen, unhesitatingly grants a mandamus compelling the inferior court to *hear the appeal.* It was not a *judicial error ;* for they had no jurisdiction at the second term to *dismiss.* They were acting in plain violation of the statute ; and unless the party had another legal remedy, and when we say remedy, we mean an *effectual* remedy, for otherwise it is none; then it was the clear duty of the court to allow the mandamus. It was their duty to vindicate the statute, which the Common Pleas had in effect, trampled under foot. But it would only be to repeat the observations we have ventured already upon the cases of the *Suffolk Common Pleas*, and the case of the *Dutchess Common Pleas*, to pursue this branch of the subject further. We might fill whole pages with the bare titles of authorities in the Court of King's Bench where in cases like this, writs of mandamus have issued to command the Sessions to hear appeals which they have improperly dismissed. Those we have selected from among scores of the like nature, will surely suffice to establish the proposition.

But perhaps it will be said that the party in this case of *The Columbia C. P.* had *another* remedy. Mr. Justice Jewett expressly admits the contrary, if we have the honor to understand his language. He says: " but it is not true, that *because* a party has *no legal remedy* unless by this writ, that it will be granted for that cause." Nor can we

fully agree to his general proposition, that "where a party has *another remedy* a mandamus will *generally* be refused." It should, indeed, be a very extraordinary case to justify an interference where the law has given the party another *equally effectual remedy.* That is the true rule on this subject. See the case of *Regina* v. *The Hull & Selby Railway Co.* 5 Queen's Bench Rep. 70. The converse of this principle, as stated by the learned judge, it is not material to determine. For if, as we have all along maintained, it is well settled that the writ of mandamus is the appropriate remedy in cases like this under consideration, then whether the party may or may not bring error upon such a wrongful refusal to hear his appeal, is a question that cannot be legitimately drawn into the discussion. The party here has suffered a grievous wrong; in palpable admitted violation of the statute, he has been denied the *right of being heard.* Then he presents a clear case for the established, summary and effectual redress by mandamus to compel the court below to *hear him,* and he can have that effectual remedy by no other process than this. It is on this very account of the prompt and summary redress of such grievances that the mandamus is called so beneficial a writ; and when a case is presented for its exercise so clear and urgent as by unquestioned principle and precedent this before Mr. Justice Jewett was, then the language of Savage, Ch. J., (10 Wend. p. 291.) applies with full force." The same obligation exists to issue the writ *as to affirm or reverse a judgment upon a return to a* writ of error." And this constitutes our full answer to the case of *The Commonwealth* v. *The Phil. Com. Pleas,* 3 Binney, 273, at least all that it deserves. We do not by any means concede with the counsel for the relator in that case that, if a writ of error would lie, the party was not entitled to the more speedy, more effectual, and we might add, much clearer, and therefore more appropriate and beneficial remedy by mandamus. Within the limits which an ancient and unbroken line of precedents in Great Britain and in our own state had established for its jurisdiction, it is our chief safeguard against the sometimes gross errors and occasionally still grosser abuses of inferior tribunals and magistrates. Instead, therefore, of renouncing this branch of their judicial prero-

gative, which belongs to the Supreme Court of our state as the *ex officio* supervisors of inferior courts and magistrates, it is their duty to guard and defend it, as the highest power confided to them by the laws and the Constitution. Not to enlarge it certainly; as it cannot be denied had gradually been done in reviewing *decisions*, made on *full hearing* by inferior tribunals, and compelling them to come to different conclusions upon matters of *fact and discretion;* but to use it in compelling them to *hear the merits and determine*, where they had illegally refused to hear them and had dismissed the appeal on any pretext whatever.

There is another branch of this jurisdiction by mandamus over inferior courts equally important and well settled upon principle, but not so clearly defined by as great a number of cases and authorities. That is the power of the King's Bench and of our Supreme Court to issue the writ of mandamus to compel an inferior court or magistrate to *enter a particular order;* or to *issue a particular writ or process*, or to do some particular act enjoined upon them by the common law or by statute, where *no legal discretion is left them.* In such cases, if the inferior court, erroneously believing that they have not the power or have a discretion in regard to using it, decline or refuse to do what the law *enjoins authoritatively* upon them, the same jurisdiction exists to compel them by mandamus to obey the imperative requisitions of the law, as to compel them to hear and determine where they have a legal discretion. The cases of *The King* v. *The Justices of Norfolk*, 4 Barn. and Ad. 238, and of *The King* v. *The Justices of Somersetshire*, 4 Id. 549, are conclusive on this point, if authorities are needed. In the first, the court admit that a mandamus would be proper to compel the Sessions to commit a church warden for the omission of rendering his account, if the act of parliament had not left the justices a discretion, the expression being "*it shall and may be lawful*" for the justices to commit. Denman, Ch. J. said: "The statute *authorizes* but does not *compel* them to commit. There is no ground, therefore, for issuing a mandamus to the magistrates." In the case of *The Somersetshire Justices*, they allowed a mandamus, after full argument, to *compel* the Sessions to record the rules of a Friendly Society or

*saving's bank* association under the provisions of an act of parliament, although the justices had on *hearing decided* that they were not entitled to be recorded, because the parties had not conformed to the provisions of the act. The same doctrine is clearly and explicitly admitted by all the judges in the case of *Rex* v. *The Justices of Buckinghamshire*, 1 Barn. & Cress. 485 ; and numerous other cases are to be found to the same effect.

Still another class of cases occurs for the legitimate exercise of this jurisdiction by mandamus over inferior courts, judges and magistrates. And it constitutes perhaps the most important as well as the most delicate branch of this judicial prerogative. Those are cases where it is sought to *correct* the decisions, or *vacate* some order or proceeding of an inferior court, judge at chambers, or magistrate which is illegal ; either as indirect violation of a statute, or from excess of jurisdiction in regard to the cause, the party, or the subject matter of the decision, order or proceeding ; and even from the *want of certain indispensable legal* prerequisites, as *notice* where the law prescribes it, and the like. In all those cases, it is well settled that the Court of King's Bench will interfere by the summary process of mandamus to correct such decisions, vacate such order, and if necessary set aside all such illegal and unauthorized proceedings. The case of *The King* v. *The Justices of the West Riding of Yorkshire*, 5 Barn. & Ad. 667, is an instance of the exercise of this jurisdiction, in *correcting a decision* of the court below. That was an *appeal* under a statute, of which due notice had been given, and being *respited* to a subsequent session, came on when the appellant applied for further respite. A majority of the bench refusing it, the appellant was proceeding with his appeal, when the respondents called on him to prove his *notice* of appeal for that court. No such notice having been given, the sessions dismissed the appeal. On application for a mandamus, Denman, Ch. J., said, " I have always understood that this court had authority to interfere for the purpose of seeing that no ILLEGAL PRACTICE prevailed at the sessions, to prevent the hearing of an appeal. I think it is pretty evident that by refusing this mandamus

justice would be shut out; and that we ought therefore to tell the magistrates that they have done wrong in refusing to hear the appeal upon the ground assigned. The rule will therefore be absolute." Patteson, J., said: "The statute requires ten days notice of the appeal to be given in the first instance, but *says nothing as to notice of a respited appeal.* If that is necessary, it must be so either by the practice of the sessions, or by general rules of law. No rule of practice at the sessions has been produced, requiring such notice; if any had been shown, it might perhaps be too much to say that a decision according to the practice was illegal, and not to be abided by. As to the general rules of law, *Rex* v. *Lambeth,* 3 D. and R. 340, shows that they do not warrant the demand of such a notice." The effect of this was to correct the decision of the sessions upon a point on which they had no legal *discretion.* The same principle was enforced in the case of *Regina* v. *The Justices of Merionethshire,* 6 Ad. and Ellis Queen's Bench R. 163. But perhaps the best authority on this point is the case we have already cited, (ante p. 366;) for nearly the same principle, *The King* v. *The Justices of the West Riding of Yorkshire,* (*Sheffield* v. *Crich,*) 5 Q. B. R. 1.

In fine the jurisdiction which we contend for in this particular is, that which was exercised in our own Supreme Court, without challenge or question, in cases like those of *The People ex rel. Fisher* v. *The N. Y. C. P.* 18 Wend. 534; *The People ex rel. Doughty* v. *The Dutchess C. P.; The People ex rel. Mapes* v. *The Columbia C. P.,* &c.; until the decision of the Court of Errors in the case of the *Oneida Judges.* It remained unimpaired by the resolution there adopted by the court; there is nothing even in the opinion of Mr. Senator Tracy, to fright the court from its propriety; for that opinion was confined to the class of cases then under consideration, in which we do not pretend to uphold their jurisdiction. The veto upon that branch of it for which we contend, has proceeded from the judges of the Supreme Court themselves. But for that voluntary abandonment, it would it is believed, have been still exercised without let or hindrance from any quarter whatever.

In such a jurisdiction, so long and so beneficially used to control inferior tribunals and magistrates, where, having no legal discretion, they refuse to do what the law positively requires, or have done what the law as positively denies them the power to do, there is nothing but a judicial power to enforce the civil rights guarantied to every citizen by the laws and constitution of his state and country. Justice and expediency alike demand that it should not be abrogated or abandoned. It reposes upon foundations of principle and authority which can not be shaken, and ought not to be undermined. Within the boundaries which the law has assigned it, the due administration of justice requires it to be sustained. It is a power of which those judges are trustees for the benefit of the people. It is a limited power, it is true, which they must not exceed, but can not abrogate. It is a sacred trust which they are not at liberty to curtail of its fair proportions, still less to surrender or renounce.